UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

REV. ALEXANDRA COE,

       Plaintiff,

   - against -

TOWN OF BLOOMING GROVE and VILLAGE OF
WASHINGTONVILLE,

       Defendants.

- - - - - - - - - - - - - - - - - - - X

06 Civ. 8149 (WCC)

**ECF CASE**

**OPINION
<u>AND ORDER</u>**

**A P P E A R A N C E S :**

        BERGSTEIN & ULLRICH, LLP
        **Attorneys for Plaintiff**
        15 Railroad Avenue
        Chester, New York 10918

STEPHEN BERGSTEIN, ESQ.

   Of Counsel

        JACOBOWITZ AND GUBITS, LLP
        **Attorneys for Defendants**
        158 Orange Avenue
        P.O. Box 367
        Walden, New York 12586

J. BENJAMIN GAILEY, ESQ.

   Of Counsel

**Conner, Senior D.J.:**

Plaintiff Reverend Alexandra Coe brings suit against defendants Town of Blooming Grove (the "Town") and Village of Washingtonville (the "Village"), pursuant to 42 U.S.C. § 1983, alleging violations of her First Amendment rights. The dispute arises out of plaintiff's attempt to obtain a permit to hold a peace rally in the Village shortly before the federal elections of November 2006. Plaintiff ultimately succeeded in doing so, but only after filing suit in this Court. Plaintiff claims that the delay caused by the need for court intervention limited her ability to publicize the rally beforehand, which depressed turnout. Plaintiff now moves for summary judgment pursuant to FED. R. CIV. P. 56, seeking a ruling that defendants' permit requirements in effect at the time of her application, as well as subsequent amendments to those requirements, are unconstitutional. Plaintiff also seeks damages. Defendants move for dismissal pursuant to FED. R. CIV. P. 12(b)(6) arguing, *inter alia*, that plaintiff's claims are moot because defendants have amended their statutes to remedy any constitutional defects that may once have existed. For the following reasons, each motion is granted in part and denied in part.

## BACKGROUND

**I.**    <u>Facts</u>

Plaintiff is an ordained minister and peace activist residing in the Village, which is a municipality located within the Town. (Bergstein Aff'm, Ex. 1. ¶ 1.) Plaintiff sought to hold a peace rally on the Moffat Library lawn (the "Lawn"), a Town-owned property located in the Village, on November 4, 2006. (*Id.* ¶ 2.) She hoped to attract between forty and seventy-five people, and the event was to feature public speakers. (*Id.*) On September 25, 2006, plaintiff spoke with an official

of the Village about the requirements for holding a rally; that official gave her a permit application (for which plaintiff paid $100) and told her to contact the Town Supervisor. (*Id.* ¶¶ 2-4.) The Town Supervisor informed plaintiff that the Town Code required her to purchase an insurance policy in order to hold a rally. (*Id.* ¶ 3.) Plaintiff, who is "unemployed and [has] very limited income," did not believe she could afford the premium on the required insurance policy. (*Id.* ¶ 5.) The relevant Town Code provision in effect at the time required permit applicants to purchase insurance coverage in the amount of one million dollars "or an amount approved by the Town," (*id.*, Ex. 2); BLOOMING GROVE, N.Y. CODE § 165-4 (1993); the record does not indicate whether the Town Supervisor told plaintiff the amount of coverage that would be required for her event. Plaintiff asked the Town Supervisor if he would be willing to waive the insurance requirement, and he responded: "absolutely not." (Bergstein Aff'm Ex. 1 ¶ 5.)

Plaintiff then brought suit in this Court and sought a preliminary injunction requiring the Town Board to issue her a permit. At a Show Cause Hearing on October 25, 2006, the Court instructed plaintiff to apply for a permit and instructed the Town Board to rule on her application within five days, notwithstanding plaintiff's inability to obtain insurance. On October 30, the Town granted plaintiff's permit request. (*Id.* ¶ 6.) The rally took place on November 4, and fewer than ten people attended. (*Id.*) Plaintiff attributes the disappointing turnout to the limited amount of time she had to publicize the rally, which was a result of the fact that she needed to seek court intervention to obtain a permit. (*Id.*)

## II.    Procedural History

Plaintiff subsequently moved for an award of attorney's fees pursuant to 42 U.S.C. § 1988,[1] which the Court denied without prejudice. *See Coe v. Town of Blooming Grove*, 2007 U.S. Dist. LEXIS 44566 (S.D.N.Y. June 18, 2007) (Conner, J.). While that motion was pending, plaintiff also moved for summary judgment. The motion for summary judgment was held in abeyance beginning February 21, 2007 to allow defendants an opportunity to amend their local laws to address plaintiff's concerns. The Town did so on February 26, 2007 (Gailey Aff'm, Ex. B at 6), and the Village followed on May 7, 2007. (*Id.*, Ex. C at 6.) (the "2007 Amendments").

Plaintiff believed that the amended statutes were unconstitutional in several respects and filed a Second Amended Complaint challenging them. Defendants responded with the present motion to dismiss, and plaintiff in turn filed a renewed motion for summary judgment, followed by a Third Amended Complaint. At a settlement conference held on December 14, 2007, defense counsel relayed defendants' willingness to amend their local laws once again to address plaintiff's remaining concerns. Although a settlement was not achieved at the conference, and plaintiff's counsel made clear that further amendment of defendants' local laws was unlikely to lead to one, defendants nevertheless amended their statutes in March 2008 (the "2008 Amendments"). Plaintiff responded by filing a Fourth Amended Complaint.

## III.    The Relevant Statutory Provisions

Plaintiff challenges several provisions of the Town and Village Codes in effect at the time

---

[1] Section 1988(b) provides in relevant part that "[i]n any action or proceeding to enforce a provision of [section 1983,] the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."

she applied for a permit (the "Original" Statutes or Codes), as well as some of the 2007 and 2008 Amendments. Defendants argue that the 2008 Amendments, which are designed to remedy the alleged constitutional shortcomings of the Original Statutes and the 2007 Amendments, make plaintiff's challenges to those earlier versions of the statutes moot. As discussed below, the Court finds that plaintiff has a viable claim for at least nominal damages based on the Town's Original insurance requirement (section 165-4 of the Original Town Code) and the Town's designation (in section 221-9 of its 2007 Amendments) of the Lawn as "not a traditional public forum." All other challenges to repealed provisions of the Original Codes and 2007 Amendments are dismissed as moot.

### A.     Challenged Town Code Provisions

Section 165-2 of the Original Town Code requires "[t]he applicant and any and all persons using the facilities . . . to indemnify and hold harmless the Town of Blooming Grove for all claims, damages, expenses, costs, etc., including, without limitation, those resulting from the negligence of the town, if any." BLOOMING GROVE, N.Y. CODE § 165-2 (1993). Section 165-3 makes the user "responsible for any damage to the facilities resulting from use under this chapter," makes the user responsible for cleaning up the facility after the event and requires the applicant to submit a refundable damage and clean-up deposit. Section 165-4 states: "The applicant agrees to provide insurance naming the town as an additional insured in the amount of $1,000,000 or an amount approved by the Town of Blooming Grove (a certificate of insurance must accompany the application)."

Plaintiff argues that the Original Town Code is unconstitutional in that it: does not provide

objective criteria for the Board to consider in evaluating an application (4th Am. Complt. ¶ 12); does not provide criteria for granting a fee waiver (*id.* ¶ 13); does not provide criteria by which the Board may adjust the amount of insurance coverage required (*id.* ¶ 14); and does not exempt indigent applicants from the insurance requirement. (*Id.* ¶ 16.)

On February 26, 2007, the Town rescinded its Original Code and enacted its 2007 Amendments. Those amendments provide ten objective criteria for the Town Board to consider in reviewing a permit application. *See* BLOOMING GROVE, N.Y. CODE § 221-10(A) (2007). Plaintiff maintains that the 2007 Amendments are nevertheless unconstitutional because they: limit permits to "bonafide non-profit group[s]" or persons without providing objective factors for determining whether a group is a "bonafide non-profit" (4th Am. Complt. ¶¶ 21-22); require users to cover all cleanup costs regardless of fault and without an exemption for indigent persons (*id.* ¶ 24); impose an application fee without an indigency exemption and without providing any objective factors to guide the Town Board in waiving or adjusting the fee (*id.* ¶¶ 25-26); designate the Lawn as "not a traditional public forum" (*id.* ¶¶ 27-28); allow for appeals of permit denials without providing objective criteria to guide the appellate review (*id.* ¶ 29); and do not exempt small groups from the permit requirement. (*Id.* ¶ 31.)

The Town Board passed its 2008 Amendments on March 10, 2008. (3/19/08 Letter from J. Benjamin Gailey, Esq., attorney for defendants, to the Court.) These amendments eliminate the term "bonafide," BLOOMING GROVE, N.Y. CODE § 221-1 (2008); limit the applicant's responsibility for damage and cleanup costs to damage "caused by the applicant or the applicant's group," *id.* § 221-4; exempt indigent applicants from the permit fee requirement, *id.* § 221-8; eliminate the statement that the Lawn is "not a traditional public forum," *id.* § 221-9; and provide that, in ruling on the appeal

of a permit denial, the Town Board shall consider only the objective permit-denial standards contained elsewhere in the Code. *Id.* § 221-11.

In response to the 2008 Amendments, plaintiff sought and was granted leave to file a Fourth Amended Complaint. In it, she alleges that the Town Code as amended in 2008 is unconstitutional for several reasons. Plaintiff first takes issue with section 221-1, which requires applicants seeking to use Town property for a "First Amendment purpose" to apply for a permit at least five days ahead of time. BLOOMING GROVE, N.Y. CODE § 221-1 (2008). The section provides further that "if the applicant demonstrates that a shorter time period for decision is necessary due to the time-sensitive nature of the intended use or event . . . then the Town Board shall hold a special meeting in order to act on the application." *Id.* Plaintiff argues that this provision is unconstitutional because it gives Town officials discretion to determine whether an event is "time-sensitive" and therefore entitled to an exemption from the five-day advance-notice requirement. (4th Am. Complt. ¶ 35; 3/26/08 Letter from Stephen Bergstein, Esq., attorney for plaintiff, to the Court.) Plaintiff challenges section 221-11, which provides for expedited appeal of a permit denial upon a showing that the planned use is "time-sensitive," on the same ground. (4th Am. Complt. ¶ 35.)

In her Third Amended Complaint plaintiff objected to section 221-1's limitation of permit eligibility to "bona fide non-profit groups" on the ground that it gives the Town discretion to decide whether a group is actually a "bona fide" non-profit. The Town, through the 2008 Amendments, removed the words "bona fide." *See* BLOOMING GROVE, N.Y. CODE § 221-1 (2008). Plaintiff responded by arguing for the first time that it is unconstitutional for the Town to prohibit "for-profit" speech in its public forums. (*See* 4th Am. Complt. ¶ 38.) Plaintiff also argues that the "community purpose" provision of section 221-1 is unconstitutionally vague and discretionary. (*See id.* ¶ 37.)

Plaintiff also challenges section 221-9 of the 2008 Town Code, which states that "[u]se of Town-owned traditional public forums for First Amendment activity is permitted pursuant to this Chapter. . . . Town-owned streets, sidewalks and parks are deemed traditional public forums." BLOOMING GROVE, N.Y. CODE § 221-9 (2008). Plaintiff claims that this provision will be confusing to non-lawyers and may indicate an intention on the part of the Town to unlawfully prohibit First Amendment activity in "designated" and "limited" public forums. (*See* 4th Am. Complt. ¶ 39.)

The result of the 2007 and 2008 Amendments is that the Town Code now contains the following features plaintiff claims are unconstitutional: the lack of an exception to the permit requirement for small groups; the Town's alleged discretion to vary the permit fee on a case-by-case basis; the Town's discretion to expedite permit applications and appeals; the limitation of permits to "non-profit" or "community" events; and section 221-9's list of traditional public forums.

### B.      Challenged Village Code Provisions

Plaintiff claims that section 125-20 of the Original Village Code is unconstitutional because it allows the Village Board to waive the permit requirement but does not provide neutral criteria to limit that discretion. (*Id.* ¶¶ 44-45.)

On May 7, 2007 the Village passed its 2007 Amendments, which provide a set of objective criteria for Village officials to consider in ruling on a permit request. WASHINGTONVILLE, N.Y. CODE § 125-20 (2007). Plaintiff alleges, however, that the Village Code's 2007 Amendments are still unconstitutional because they: impose a permit application fee but do not provide an indigency exemption or objective criteria to prevent the Village Board from "imposing a fee on the basis of content" (4th Am. Complt. ¶ 48); make the user responsible for cleanup costs regardless of fault and

without an indigency exemption (*id.* ¶¶ 50-51); impose a $1 million insurance policy requirement (for certain events) without an indigency exemption (*id.* ¶¶ 52-53); and require the user to indemnify the Village for any claims "resulting from" the event. (*Id.* ¶ 54.)

On March 3, 2008, the Village Board of Trustees passed the 2008 Amendments to the Village Code. These amendments: exempt indigent applicants from the permit-fee requirement, WASHINGTONVILLE, N.Y. CODE § 125-19(c) (2008); provide that the applicant shall be responsible for damage "caused by the applicant or applicant's group," *id.* § 125-22; limit indemnification to claims "caused directly by" the applicant or the applicant's group, *id.* § 125-26; and exempt indigent applicants from the indemnification requirement when they "use[] Village property outside of a building for a First Amendment purpose." *Id.*

Plaintiff brings several challenges to the 2008 Village Amendments. Section 125-10 requires permit applications to be submitted at least five days before the planned event, but provides that "if the applicant demonstrates that a shorter time period for decision is necessary due to the time-sensitive nature of the intended use or event, then the Board of Trustees shall hold a special meeting in order to act on the application." *Id.* § 125-10. As with section 221-1 of the Town Code, plaintiff argues that this gives local officials impermissible discretion to decide whether a proposed event is "time sensitive." (*See* 4th Am. Complt. ¶ 58.) Plaintiff argues that section 125-21 of the 2008 Village Code, which provides for expedited appeal of a permit denial upon a showing that the event is "time sensitive," is unconstitutional for the same reason. (*See id.*)

Plaintiff argues that Village Code section 125-10's provision limiting permits to groups or persons seeking to use Village property for a "non-profit or community purpose" is unconstitutional because it excludes for-profit speech from public forums and gives Village officials discretion to

8

determine whether a proposed event serves a "community purpose." (*Id.* ¶¶ 59-60.)

With the 2008 Amendments in place, the Village Code contains the following provisions that plaintiff claims are unconstitutional: the alleged discretion Village officials have to vary permit fees on a case-by-case basis; the limited nature of the indigency exemption to the insurance requirement; the discretion Village officials have to expedite permit applications and appeals; the limitation of permits to "non-profit" events; and the discretion Village officials have to determine whether a proposed event serves a "community purpose."

## DISCUSSION

### I.  <u>Standard of Review</u>

On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all of the well-pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, (1984); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "The plaintiff's factual allegations must be enough to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances about which the plaintiff complains are insufficient as a matter of law. *See Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978). The Court may consider the facts alleged in the complaint as well as any document attached as an exhibit to the complaint or incorporated by reference. *See* FED. R. CIV. P. 10(c); *Dangler v. N.Y. City Off Track Betting Corp.*, 193 F.3d 130,

138 (2d Cir. 1999); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996).

Summary judgment is appropriate when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The Court must resolve all ambiguity in favor of the non-moving party and draw every permissible factual inference in that party's favor. *See Anderson*, 477 U.S. at 255. The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). When the movant has met that burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P 56(e)) (citations omitted) (emphasis in original).

## II.  <u>Standing</u>

To have standing, a plaintiff must meet several requirements. First, she must "have suffered 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 170 (2d Cir. 1999) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Second, the plaintiff must show that the injury was caused by the challenged activity of the defendant. *Id.* Finally, the

plaintiff must demonstrate that "the injury is apt to be redressed by a remedy the court is prepared to give." *Id.*

The requirement of standing means that, ordinarily, a plaintiff cannot "rest his claim to relief on the legal rights or interest of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). But this rule is relaxed in the First Amendment context where a plaintiff alleges that a statute is substantially overbroad. *See Lerman v. Bd. of Elections*, 232 F.3d 135, 144 (2d Cir. 2000). Under the overbreadth doctrine, a plaintiff may challenge a statute so long as there is "'a substantial risk that application of the provision will lead to the suppression of speech.'" *Id.* (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). This allows the plaintiff to assert the rights of third parties who are not before the court, *id.*, even if the plaintiff's conduct could lawfully "'be regulated by a statute drawn with the requisite narrow specificity.'" *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957 (1984) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). The overbreadth doctrine is based on the concern that an overbroad statute's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. For a court to entertain an overbreadth challenge, there must be "a realistic danger that the statute . . . will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

In the present case, most of the provisions of the Town and Village Codes that plaintiff challenges have never actually been applied to her, nor has plaintiff attempted to show that their potential application has chilled her First Amendment activity. The only exceptions are the Original Town Code's insurance requirement, which deterred plaintiff from applying for a permit in the fall

of 2006, and the Town's designation (via its 2007 Amendments, subsequently repealed by the 2008 Amendments) of the Lawn as "not a traditional public forum," which plaintiff claims deterred her from applying for a permit to use that property. Plaintiff's standing to challenge any other provision of defendants' Codes must be based on overbreadth.

We find that plaintiff has standing to pursue all of her challenges to the Town and Village Codes except for one: the provisions limiting permits to "a non-profit group or person who seeks to use Town [Village] property or facilities for a legal use and for a non-profit or community purpose." BLOOMING GROVE, N.Y. CODE §221-1 (2008); WASHINGTONVILLE, N.Y. CODE § 125-10 (2008).[2] Plaintiff claims that these provisions are unconstitutional for two reasons: they exclude for-profit First Amendment activity from public forums; and they give Town and Village officials unlawful discretion to determine whether a proposed event serves a "community purpose." (*See* 4th Am. Complt. ¶¶ 37-38, 59-60.)

It is well established that the First Amendment overbreadth doctrine does not apply to regulations of commercial speech. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 670 (1994); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496-497 (1982); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 153 n.16 (2d Cir. 2001). The reason for this limitation is that "[c]ommercial speech is not as likely to be deterred as noncommercial speech, and therefore does not require the added protection afforded by the overbreadth approach." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 463 n.20 (1978). "[C]ommercial speech is more hardy, less likely to be 'chilled,' and not in need of surrogate litigators." *Bd. of Trs. of S.U.N.Y. v. Fox*, 492 U.S. 469, 481

---

[2] These provisions of the Town and Village Codes are identical except that the Village Code omits the words "non-profit" before the word "group." *See* WASHINGTONVILLE, N.Y. CODE § 125-10 (2008).

(1989).

Plaintiff is an individual and does not claim to represent a for-profit group. She has not expressed any intention of organizing an event featuring for-profit or commercial speech. This makes any possibility that the "non-profit" provisions of the Town and Village Codes will affect her First Amendment rights purely "conjectural." *Latino Officers Ass'n*, 170 F.3d at 170. Therefore, plaintiff does not have standing to challenge these provisions.

Both section 221-1 of the Town Code and section 125-10 of the Village Code limit permit eligibility to persons or groups who seek to use Town or Village property for "a non-profit *or* community purpose." By their terms, the statutes exempt non-profit speech from the "community purpose" test; it is only for-profit speech that must meet this requirement. Because she does not have standing to challenge the restrictions on for-profit speech, plaintiff also lacks standing to challenge the "community purpose" requirement, since that provision applies only to for-profit speech.

## III.   **Mootness**

Defendants urge the Court to dismiss plaintiff's challenges to the Original Town and Village Codes and 2007 Amendments as moot because, in their view, the 2008 Amendments removed any unconstitutional provisions in these earlier versions of the statutes. Plaintiff asks the Court to rule on the constitutionality of the now-repealed provisions she has challenged because, absent a ruling that those provisions are unconstitutional, defendants will be free to repeal the 2008 Amendments and re-enact an earlier version of their local laws.

## A.      Plaintiff's Claim for Equitable Relief Based on Repealed Provisions is Moot

An action is moot "when the parties have no 'legally cognizable interest' or practical 'personal stake' in the dispute, and the court is therefore incapable of granting a judgment that will affect the legal rights as between the parties." *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 94 (2d Cir. 2007) (quoting *Davis v. New York*, 316 F.3d 93, 99 (2d Cir. 2002). The mootness doctrine is derived from Article III of the United States Constitution, which provides that federal courts may decide only live cases or controversies. *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998). Ordinarily, a defendant's voluntary cessation of his allegedly wrongful conduct will not moot a case unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968); *see also Adarand Constructors v. Slater*, 528 U.S. 216, 222 (2000); *Irish Lesbian & Gay Org.*, 143 F.3d at 647. Otherwise, "the courts would be compelled to leave [the] defendant . . . free to return to his old ways." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (internal quotation marks and citations omitted; alterations in the original).

A different standard applies, however, where the defendant is a government entity that has repealed or amended an allegedly unconstitutional statute. In such cases, courts "routinely" find constitutional challenges to the original version of the statute moot. *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 61 (2d Cir. 1992); *see also Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375 (2d Cir. 2004); *Granite State Outdoor Adver., Inc. v. Town of Orange*, 303 F.3d 450, 451-52 (2d Cir. 2002). A legislature's representation that it has discontinued a practice is entitled to deference from the courts. *Lamar Adver.*, 356 F.3d at 376

(quoting *Harrison & Burrowes*, 981 F.2d at 59); *Granite State*, 303 F.3d at 451-52 ("[T]here is no

reason to think that, having completely revised its regulations through proper procedures, the Town

has any intention of returning to the prior regulatory regime."); *Associated Gen. Contractors of

Conn., Inc. v. City of New Haven*, 41 F.3d 62, 65-67 (2d Cir. 1994).  And the Second Circuit has

made clear that such deference is "the rule, not the exception."[3]  *Lamar Adver.*, 356 F.3d at 377.

Here, defendants have amended their Codes twice since this action began.  There is no reason

to believe that these amendments represent anything other than a good-faith effort on the part of

defendants to bring their local laws into compliance with the requirements of the First Amendment

and stave off further litigation.  Prior to the enactment of both the 2007 and 2008 Amendments,

defense counsel submitted drafts of the proposed amendments to plaintiff's counsel for the latter's

---

[3] The Second Circuit acknowledged in *National Advertising Co. v. Town of Babylon*, 900
F.2d 551, 554 n.2 (2d Cir. 1990), that a municipality's voluntary repeal of a statute does not
necessarily moot a challenge to the statute.  But the only case that the court cited for this
proposition was *Aladdin's Castle*, in which the municipal defendant had expressly stated its
intention to reinstate the repealed statute if the court ruled in its favor.  *See* 455 U.S. at 289 &
n.11 ("[T]he city's repeal of the objectionable language would not preclude it from reenacting
precisely the same provision if the District Court's judgment were vacated. . . .  Indeed, the city
has announced just such an intention.")  As noted, there is no indication here that defendants
intend to reinstate the challenged provisions of their Original Codes or 2007 Amendments.
Moreover, the Second Circuit has substantially limited *Babylon*:
> *Aladdin's Castle*, the case upon which we relied in *Babylon*, was unusual . . . in
> that the defendant city had amended its ordinance numerous times in response to
> court rulings and had expressed an intent to reenact the offending provisions were
> the litigation to be dismissed for lack of jurisdiction.  Moreover, in *Babylon*, it is
> not altogether clear that the amended versions of the challenged ordinances were
> ever even provided to this Court, and the appellant towns continued–even after
> passage of the purported amendments–to press their appeals from the district
> court's judgment against them, which could have been taken as an implicit
> concession by the towns that the amendments were not sufficient to deprive the
> Court of jurisdiction. . . .  It also does not escape our attention that the discussion
> of mootness in *Bablyon* was relegated to a footnote.

*Lamar Adver.*, 356 F.3d at 376 & n.14 (internal citations omitted).

review and input. (*See* 3/19/08 Letters from J. Benjamin Gailey to the Court.) In the case of the 2008 Amendments, plaintiff's counsel made several substantive suggestions, most of which defendants adopted. (*See id.*) There is no indication whatever that the amendments were an eleventh-hour attempt to evade judicial review of any challenged provision, *see, e.g.*, *Yassky v. Kings County Democratic County Comm.*, 259 F. Supp. 2d 210, 215 (E.D.N.Y. 2003), or that defendants have any intention of reinstating the Original Codes or the 2007 Amendments. *See, e.g.*, *Aladdin's Castle*, 455 U.S. at 289 & n.11. Therefore, plaintiff's claim for equitable relief based on the repealed provisions of the Original Codes and 2007 Amendments is moot because the Court finds no reason to believe that defendants will reinstate any of those provisions.

### B. Plaintiff's Claims for Damages Are Not Moot

Plaintiff's claims for compensatory and nominal damages based on the "Town Board's delayed approval of her permit application in October-November 2006" and plaintiff's alleged inability to stage a peace rally at the Lawn "during the time that Town law § 221-9 expressly prohibited public assemblies at that location" (4th Am. Complt., Prayer for Relief ¶¶ d, e) are not moot. A defendant's change in conduct does not moot a case if the plaintiff has stated a claim for damages. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001); *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Employees*, 466 U.S. 435, 442 (1984) ("The amount at issue is undeniably minute. But as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."); *Van Wie v. Pataki*, 267 F.3d 109, 115 n.4 (2d Cir. 2001). Even a claim for nominal damages is sufficient to prevent mootness. *See Price v. N.Y. State Bd. of Elections*, 2007 U.S. Dist.

LEXIS 78277, at *2 (N.D.N.Y. Oct. 22, 2007); *Sugarman v. Vill. of Chester*, 192 F. Supp. 2d 282, 290 (S.D.N.Y. 2002) (Conner, J.).

The record reveals that plaintiff was damaged by her difficulty in securing a permit in the fall of 2006. She alleges that the delay, which the Town caused by seeking to enforce its unconstitutional insurance requirement, "significantly hampered [her] ability to organize and publicize" the rally (4th Am. Complt. ¶ 19), thus depressing turnout and limiting the effectiveness with which she was able to promote her message and engage in First Amendment association. Although defendants attempt to dismiss this as "speculation," it seems obvious that reducing the amount of time one has to plan and promote an event, and creating uncertainty as to whether the event will occur at all, can be expected to decrease turnout and make the event less successful and effective in promoting its message. Thus, plaintiff's declaration that the delay in obtaining a permit hurt turnout – an assertion that is not effectively contradicted and that we have no reason to doubt – shows that the insurance requirement significantly interfered with plaintiff's exercise of her First Amendment rights, giving rise to a claim for damages. *See, e.g.*, *Knoeffler v. Town of Mamakating*, 87 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2000) (Conner, J.) ("The denial of First Amendment rights, or 'of a particular opportunity to express one's views,' can give rise to a compensable injury.") (quoting *Irish Lesbian & Gay Org.*, 143 F.3d at 649).

Plaintiff also claims to have been damaged by the 2007 Town Amendments' designation of the Lawn as "not a traditional public forum," in that this deterred her from exercising her First Amendment rights there. (*See* 4th Am. Complt. ¶ 40.) As discussed below, we find that the Lawn is a traditional public forum. By alleging that the Town's unlawful attempt to prohibit First Amendment activity in a traditional public forum deterred her from exercising her First Amendment

rights, plaintiff has stated a claim for nominal damages.

There is no indication in the Fourth Amended Complaint, in plaintiff's moving papers or anywhere in the record that any provision of either defendants' laws other than the Original Town Code's insurance requirement and the 2007 Town Code's designation of the Lawn as "not a traditional public forum" contributed to plaintiff's injuries. There is no allegation that any of the other challenged provisions were enforced against plaintiff, contributed to her difficulty in obtaining a permit in the fall of 2006 or deterred her from applying for a permit or otherwise exercising her First Amendment rights on any other occasion.[4] The other challenged provisions did not contribute to plaintiff's claims for damages and therefore could support only equitable relief. But, as discussed above, plaintiff's claim for equitable relief based on the repealed provisions is moot, and so the challenges to all other repealed provisions are dismissed.

## IV.    Is the Lawn a Traditional Public Forum?

We first consider whether the Lawn is a traditional public forum. Plaintiff argues that it is; defendants maintain that it is not. Governmental restrictions of speech in a non-public forum are constitutional as long as they are reasonable and do not represent an attempt by the government to suppress speech with which it disagrees. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,

---

[4] To conclude that plaintiff has alleged damages based on any other provision of defendants' ordinances would require us to make assumptions, unsupported by the record before us, about plaintiff's thoughts and motivations, such as whether the potential enforcement of any other provision deterred her from applying for a permit. Engaging in such a strained interpretation of the record in order to reach the constitutionality of all the challenged provisions would be inconsistent with the principle that, as a matter of judicial restraint, courts should avoid unnecessary adjudication of constitutional issues. *See, e.g.*, *Anobile v. Pelligrino*, 303 F.3d 107, 123 (2d Cir. 2002).

473 U.S. 788, 800 (1985). If, as plaintiff argues, the Lawn is a traditional public forum, restrictions on speech taking place there will be valid only if they are content-neutral regulations of the time, manner and place of speech; are narrowly tailored to an important governmental interest and leave open alternative channels of communication. *See Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The Second Circuit has identified several factors to be considered in determining whether a government-owned property is a traditional public forum. The "'primary factor'" is "'how the locale is used.'" *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 547 (2d Cir. 2002) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 160 (3d Cir. 1982)). Additional considerations are "the forum's physical characteristics and the context of the property's use, including its location and purpose." *Id.* at 547. The government's intent in creating the forum and its need to control expressive activity taking place there, as shown by its policies and regulations, are factors as well. *Id.* Also relevant is "whether the property in question 'is part of a class of property which by history or tradition has been open and used for expressive activity.'" *Id.* (quoting *Warren v. Fairfax County*, 196 F.3d 186, 190 (4th Cir. 1999)). Based on these considerations, we find that the Lawn is a traditional public forum.

### A.    The Lawn Has the Physical Characteristics of a Public Park

Traditional public forums are places that "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Public streets and parks, which "'have immemorially been held in trust for the use of the

public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions'" fall into this category. *Id.* (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)). In fact, the Supreme Court has described public parks as "the quintessential public forums," *Perry*, 460 U.S. at 45, and the Second Circuit has called the public park one of "the classic examples" of the traditional public forum. *Hotel Employees*, 311 F.3d at 544.

Plaintiff describes the Lawn as a "public park." (Pl. Mem. Supp. Summ. J. at 8.) She argues that the Lawn is a traditional public forum because it

> is an open public thoroughfare. . . . Surrounded by sidewalks and featuring war memorials and public space to accommodate public assemblies, this unenclosed park invites the public for quiet reflection and vocal commemorations. At one of [the Town's] busiest intersections, this park is comparable to a public square. Not only does this park possess the physical attributes of a public forum, but [it] . . . has traditionally been used for public events, particularly Memorial Day and Veterans' Day commemorations. . . . The presence of war memorial tablets confirms this community intended the park as a gathering place.

(*Id.* at 8-10 (internal quotation marks and citations omitted).)

Defendants do not dispute this description of the Lawn's physical characteristics, other than the denomination of the Lawn as a "thoroughfare." (*See* Defs. Reply Mem. at 11-14.) Instead, they argue that these characteristics do not make the Lawn a park for First Amendment purposes. (*See id.*) Defendants resist the public-forum designation on the grounds that the Lawn has never "been devoted to assembly and debate" and has been subject to only "occasional, selective use on Memorial Day or Veteran[s'] Day." (*Id.* at 12-13.) Defendants note that these Memorial and Veterans' Day commemorations amount to only "ten occasions over a sixty-nine year period." (*Id.* at 11.)

We agree with plaintiff that the Lawn's physical characteristics are consistent with those of a park, a traditional public forum. The property is a small but open grassy area in a prominent location in the Village. (*See* Bergstein Aff'm, Ex. 4 (color photographs of the Lawn).) The Lawn is open to the public and is located between a sidewalk – another "quintessential public forum[]," *Perry*, 460 U.S. at 45 – and the local library, a public building. (*See* Bergstein Aff'm, Ex. 4.) Although the absence of walkways and benches may limit the extent to which members of the public enter or remain on the Lawn, the presence of war memorials indicates a desire to attract visitors. All of this convinces us that the Lawn is a public park for purposes of this decision, making it "part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Employees*, 311 F.3d at 547 (internal quotation marks omitted).

Although there is no dispute that, in the abstract at least, a park is a "quintessential public forum[]," *Perry*, 460 U.S. at 45, the Second Circuit has stopped short of holding that "a dedicated public park must necessarily qualify as a traditional public forum, without regard to the context of its location and use." *Hotel Employees*, 311 F.3d at 548; *cf. United States v. Kokinda*, 497 U.S. 720, 727 (1990) ("The sidewalk leading to the entry of the post office is not the traditional public forum sidewalk referred to in *Perry*."). Further inquiry is therefore warranted. We agree with defendants that ten events in sixty-nine years is a rather limited level of public usage. (*See* Defs. Reply Mem. at 11.) The question, therefore, is whether property that has the physical characteristics of a public forum, and is suitable for public events, can be classified as non-public solely because it has been used only sporadically for public gatherings.

**B.      The Lawn is a Suitable Forum for Public Expressive Events**

It is well established that property having the physical characteristics of a public forum can nevertheless be classified as non-public based on other considerations – in particular, the government's interest in ensuring that the property is kept suitable for its intended use. "[T]he government – like other property owners – 'has power to preserve the property under its control for the use to which it is lawfully dedicated . . . .'" *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)); *see also Hotel Employees*, 311 F.3d at 547 (stating that the government's "need for controlling expressive activity on the property, as evidenced by its policies or regulations" is a factor in the public-forum inquiry). This is true even of places that would otherwise be "quintessential" public forums, such as sidewalks. *See Kokinda*, 497 U.S. at 727-30 (holding that a sidewalk located on U.S. Postal Service property was a non-public forum because it did not have "the characteristics of public sidewalks traditionally open to expressive activity"); *Greer* 424 U.S. at 836-37 (holding a military base to be a non-public forum despite the fact that parts of it were open to the public, including streets and sidewalks within the base).

Cases classifying as "non public" government property that has at least some physical characteristics of a traditional public forum tend to involve a showing that public-forum status would significantly undermine the property's intended purpose. Thus, in *Greer* the Court found that allowing political leafleting on a military base would conflict with that institution's interests in training soldiers and avoiding the entanglement of the military with politics. *See* 424 U.S. at 837-39. In *Lee* the Court ruled that forcing the government to allow widespread solicitation and sale of religious materials on public walkways in an airport terminal would interfere with the orderly and

efficient transport of passengers. 505 U.S. at 682-83. Where, on the other hand, the expressive activity at issue is not likely to undermine the purpose of the forum, the case for classifying the forum as non-public is much weaker. *See, e.g.*, *Paulsen v. County of Nassau*, 925 F.2d 65, 71 (2d Cir. 1991) (affirming the designation of the Nassau Coliseum, a state-owned property containing an 18,000-seat arena, as a public forum because "distributing handbills on the plaza and sidewalks is not likely . . . to interfere with the mood or the quality of the Coliseum arena events").

Here, the fact that the Lawn has historically hosted only a fairly small number of expressive events does weigh in favor of non-public status. *See Hotel Employees*, 311 F.3d at 547. But that consideration is outweighed by the fact that opening the Lawn to plaintiff's expressive activity would not substantially interfere with the intended purpose of the property. Defendants have not identified any such conflict, and none is apparent to the Court. We are not aware of any case holding, as defendants urge this Court to do, that a government-owned property that has the physical characteristics of a traditional public forum and is apparently suitable for public events was a non-public forum solely because past usage of the property for expressive events was too infrequent. And we decline to make such a ruling, because it would unfairly limit plaintiff's First Amendment rights based on the extent to which earlier generations of Town residents chose to exercise theirs.

## C.     Defendants' Intent Was Not Inconsistent With the Creation of a Public Forum

The record does not contain any statement of governmental purpose or intent as to whether the Lawn is a public forum. Defendants point out that the Lawn has never officially been designated a public forum. (Defs. Mem. Supp. Mot. Dismiss at 6.) The 2007 Amendments to the Town Code designated the Lawn "not a traditional public forum," *see* BLOOMING GROVE, N.Y. CODE § 221-9

(2007), but, as part of its effort to settle this case, the Town removed that provision in its 2008 Amendments. *See* BLOOMING GROVE, N.Y. CODE § 221-9 (2008).

The lack of a statement of official purpose is of limited importance, however, since a government's stated intention does not settle the inquiry. As the Second Circuit explained in *Paulsen*: "Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: [the government's] policy and past practice, as well as the nature of the property and its compatibility with expressive activity." 925 F.2d at 69. Therefore, in *Paulsen*, the county government's "bare assertion that [it] did not mean to permit noncommercial speech on Coliseum grounds [was] not conclusive." *Id.*

Turning to the present case, the factors highlighted in *Paulsen* lead us to conclude that defendants did not clearly evince an intent to create the Lawn as a public forum. Defendants' practice has been to sponsor (albeit only occasionally) expressive events there in the form of Memorial Day and Veterans' Day commemorations. As discussed above, the Lawn is clearly park-like in nature, and there is no apparent reason not to consider it a park – a "quintessential" public forum – for purposes of this case. Finally, the record before us indicates that the Lawn is perfectly compatible with expressive activity, and defendants have not offered any meaningful reason to believe otherwise. We therefore conclude that the Lawn is a traditional public forum.

## V.    The Town and Village Insurance Requirements

A government regulation based on the content of speech is presumptively invalid and will be upheld only if it passes strict scrutiny, meaning that it must be necessary to advance a compelling governmental interest, "precisely tailored" to serve that interest and "the least restrictive means

readily available" for advancing the government's purpose. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 n.15 (2d Cir. 2006) (internal quotation marks and citation omitted). A regulation that is content neutral, however, need only survive intermediate scrutiny. *Id.* at 98. A content-neutral regulation of the time, place and manner of speech is valid, even applied to speech in a traditional public forum, if the regulation is "reasonable, . . . narrowly tailored to serve a significant governmental interest, and leave[s] open ample alternative channels for communication of the information." *Id.* (internal quotations omitted); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

A regulation of expressive activity will be considered content neutral if "it is justified without reference to the content of the regulated speech" and "serves purposes unrelated to the content of expression," even if the regulation "has an incidental effect on some speakers or messages but not others." *Mastrovincenzo*, 435 F.3d at 98 (internal quotation marks and citations omitted). Therefore, a regulation that targets only the "potentially harmful secondary effects of speech" is content neutral and warrants only intermediate scrutiny. *Id.* (internal quotation marks and citation omitted).

The requirement that a content-neutral time, manner or place regulation be narrowly tailored to serve a significant governmental interest does not mean that the regulation must be the least restrictive means available for that purpose. *Id.* (internal quotation marks omitted). Instead, the narrow tailoring requirement is satisfied if the government's purpose "*would be achieved less effectively absent the regulation.*" *Id.* (internal quotation marks and citation omitted; emphasis in the original). "A content-neutral 'time, place or manner' restriction will be considered narrowly tailored unless 'a substantial portion of the burden on speech does not serve to advance its goals.'" *Id.* (quoting *Ward*, 491 U.S. at 799 (1989)).

25

We first consider whether defendants' insurance requirements are content neutral, and we conclude that they are. *See id.* The insurance requirements serve to protect defendants from financial liability arising from public events on their property. *See, e.g.*, *Urlaub v. Inc. Vill. of Bellport*, 498 F. Supp. 2d 614, 621 (E.D.N.Y. 2007). This goal is related only to the "potentially harmful secondary effects of speech," *Mastrovincenzo*, 435 F.3d at 98 (internal quotation marks and citation omitted), not to content. The insurance requirements are therefore facially content neutral, so the Court will apply intermediate scrutiny. *See id.*

Plaintiff challenges two aspects of the Original Town insurance requirement: the lack of an exemption for indigent applicants; and the fact that the statute allows the Town Board to vary the amount of coverage required but does not provide any objective criteria to limit that discretion. (*See* 4th Am. Complt. ¶¶ 14, 16.) Plaintiff also challenges the lack of an indigency exemption in the Village's insurance requirement. (*See id.* ¶¶ 52-53.)

### A.        The Town's Discretion to Vary the Amount of Coverage Required

Supreme Court precedent indicates that this aspect of section 165-4 is unconstitutional. In *Forsyth*, the Forsyth, Georgia County Board of Commissioners had enacted an ordinance requiring every applicant for a public-assembly permit to "pay in advance for such permit, for the use of the County, a sum not more than $1,000.00." 505 U.S. at 126 (internal quotation marks and citation omitted). The county administrator had the authority to "adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." *Id.* (internal quotation marks and citation omitted). The decision regarding the amount at which to set the fee for a given event, or whether to charge a fee at all, was

left totally "to the whim of the administrator." *Id.* at 132-33.

The Court held the ordinance to be unconstitutional. *Id.* at 137. The Court acknowledged that the government may, consistent with the First Amendment, impose permit requirements on people wishing to hold rallies, parades and marches. *See id.* at 130 (citing *Cox v. New Hampshire*, 312 U.S. 569, 574-76 (1941)). But a permit system must not "delegate overly broad licensing discretion to a government official." *Id.*; *see also Shuttlesworth v. Birmingham*, 394 U.S. 147, 153 (1969). A permit scheme is a form of prior restraint on expressive activity, and therefore must contain "'narrow, objective and definite standards to guide the licensing authority.'" *Forsyth*, 505 U.S. at 131 (quoting *Shuttlesworth*, 394 U.S. at 150-51). Such standards are necessary because "[a] government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Id.* at 130-31 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)). The ordinance at issue in *Forsyth* did not contain the necessary standards to limit the county official's discretion, so there was nothing to prevent the official from "encouraging some views and discouraging others through the arbitrary application of fees." *Id.* at 133.

Section 165-4 of the Original Town Code is closely analogous to the ordinance held unconstitutional in *Forsyth*. Section 165-4 requires permit applicants to purchase insurance "in the amount of $1,000,000 or an amount approved by the Town." The Town's discretion to set the amount of coverage required is completely unlimited. As in *Forsyth*, there are no "narrowly drawn, reasonable and definite standards" that Town officials must follow, 505 U.S. at 133 (internal quotation marks and citation omitted); in fact, there are no standards at all. This raises the

27

unacceptable possibility that Town officials will seek to discourage speech with which they disagree by requiring a greater amount of insurance coverage than they would demand for an event featuring speech they find unobjectionable. Because it provides such unfettered discretion, section 165-4 is facially invalid. *See id.* at 137; *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322-23 (2002); *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951); *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1256 (11th Cir. 2004); *Nationalist Movement v. City of York*, 425 F. Supp. 2d 574, 585 (M.D. Pa. 2006) ("Without specific guidelines calculating the insurance and deposit requirements using content-neutral factors, thereby limiting the scope of the city officials' discretion, these provisions contain the possibility of censorship through uncontrolled discretion.") (internal quotation marks and citation omitted), *rev'd in part on other grounds*, 481 F.3d 178 (3d Cir. 2007); *Rock Against Racism v. Ward*, 658 F. Supp. 1346, 1356 (S.D.N.Y. 1987) ("The lack of concrete, ascertainable standards to guide the Parks Department's administration is fatal to this aspect of the Guidelines, which is facially invalid."), *rev'd in part on other grounds*, 848 F.2d 367 (2d Cir. 1988); *cf. Paulsen v. Gotbaum*, 1992 U.S. Dist. LEXIS 396, at *21-22 (S.D.N.Y. Jan. 15, 1992).

**B.    The Town Insurance Requirement's Lack of an Exemption for Indigent Applicants**

We first consider whether failing to provide an exemption for indigent applicants furthers a significant governmental interest. *See Mastrovincenzo*, 435 F.3d at 98. Although the parties have devoted little discussion in their briefs to this issue, we acknowledge that the Town has a significant interest in limiting its financial liability in the event an injury occurs at a public gathering on its property. *See E. Conn. Citizens Action Group v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983)

("[T]he state has a legitimate interest in protecting itself from liability for injuries associated with the use of its property."); *Wilson ex rel. U. S. Nationalist Party v. Castle*, 1993 U.S. Dist. LEXIS 9726, at *8 (E.D. Pa. July 16, 1993).

However, we conclude that section 165-4 of the Original Town Code is not a narrowly tailored means of furthering that interest. The burden that the failure to exempt indigent persons from the insurance requirement places on the exercise of First Amendment rights is too great to justify whatever marginal benefit this provision confers on the Town. We can only speculate as to the nature and importance of that benefit, since defendants have not offered any justification for the lack of an indigency exemption.

In contrast to whatever undefined benefit the lack of an indigency exemption may provide the Town, the burden it imposes on the First Amendment rights of plaintiff and others of limited financial means is real, severe and unacceptable. "Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943). Thus, while the government may operate a permit system to regulate competing uses of a public forum, *see, e.g.*, *Thomas*, 534 U.S. at 322-23, courts have not hesitated to strike down regulations that impose prohibitive financial costs on the exercise of First Amendment rights. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1052 (9th Cir. 2006); *E. Conn. Citizens*, 723 F.3d at 1056-57; *Van Arnam v. GSA*, 332 F. Supp. 2d 376, 406 (D. Mass. 2004) ("[I]n virtually all such cases, the courts have concluded that the [permit fee] requirement was unconstitutional as applied to the plaintiff unable to pay."); *MacDonald v. Chi. Park Dist.*, 1999 U.S. Dist. LEXIS 7416, at *19 (N.D. Ill. Mar. 9, 1999); *Toback v. Safir*, 1996 U.S. Dist. LEXIS 15271, at *7 (S.D.N.Y. Oct. 17, 1996); *Pritchard v. Mackie*, 811 F. Supp. 665, 668

(S.D. Fla. 1993); *Wilson*, 1993 U.S. Dist. LEXIS 9726, at *10; *Paulsen*, 1992 U.S. Dist. LEXIS 396, at *16; *Invisible Empire of Knights of Ku Klux Klan v. Mayor*, 700 F. Supp. 281, 285-86 (D. Md. 1988); *Invisible Empire Knights of Ku Klux Klan v. West Haven*, 600 F. Supp. 1427, 1435 (D. Conn. 1985) ("It has been well established in recent years that the exercise of fundamental constitutional rights cannot be conditioned upon an individual's wealth.").

Specifically, several courts, including the Second Circuit, have held insurance requirements like those involved here unconstitutional as applied to persons who could not afford the premium. The Second Circuit addressed the issue in *Eastern Connecticut Citizens*. That case involved an advocacy group, ECCAG, that wanted to hold a march along an abandoned railway bed for the purposes of promoting public transportation and opposing the construction of a new highway. *E. Conn. Citizens*, 723 F.2d at 1052. The railway bed was owned by the state, which required the group to obtain a permit for its march. *Id.* The state conditioned the permit on, *inter alia*, the group's purchasing a $75,000 insurance policy naming the state as a co-insured. *Id.*

ECCAG argued that this requirement was either facially unconstitutional or, in the alternative, unconstitutional as applied to a group, such as itself, that was unable to afford the insurance premium. *Id.* at 1053. The court agreed that the requirement was unconstitutional as applied to ECCAG.[5] *Id.* at 1057. In reaching this conclusion, the court applied strict scrutiny and held the insurance requirement unconstitutional because it was not the least restrictive means available for advancing the state's interest in avoiding a financial loss relating to ECCAG's use of the railway bed. *See id.* at 1056-57. The court noted that the insurance requirement "substantially

_____

[5] The court acknowledge the possibility that the insurance requirement might be valid "when reasonably applied." *Id.* at 1057.

infringed" ECCAG's First Amendment rights in a manner unjustified by that governmental interest. *See id.* at 1057.

After *Eastern Connecticut Citizens* was decided, however, the Supreme Court held that intermediate scrutiny, not strict scrutiny, is the proper level of review for content-neutral time, manner and place regulations of speech. *See Ward*, 491 U.S. at 797-99.[6] It is therefore unclear whether *Eastern Connecticut Citizens* is, at the present time, binding authority in this Circuit. Nevertheless, its analysis of the dangers that overly burdensome financial requirements pose to First Amendment rights is persuasive to this Court. And its holding – that conditioning the right to freedom of expression on the purchasing of an insurance policy that the speaker can not afford violates the First Amendment – is well supported even under intermediate scrutiny, as more recent cases from other circuits demonstrate.

In *Van Arnam*, the plaintiff sought to hold a rally outside the John F. Kennedy Federal Building in Boston. 332 F. Supp. 2d at 379. The General Services Administration, the federal agency that administered the property, required the plaintiff to "indemnify and save harmless the United States, its agents and employees against any and all loss, damage, claim or liability whatsoever" relating to her use of the property. *Id.* (internal quotation marks omitted). The court issued a declaratory judgment that this requirement was unconstitutional as applied to the plaintiff.

---

[6] The Court explained:

The Court of Appeals erred in sifting through all the available or imagined alternative means of [advancing the government's interest] in order to determine whether the city's solution was "the least intrusive means" of achieving the desired end. . . . Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.

*Id.*

*Id.* at 407. Although the regulation at issue was an indemnification clause and not an insurance requirement, the court adopted the reasoning of cases involving insurance requirements because it found that "while the Clause does not technically compel event insurance, the realities require all but the judgment-proof and the foolhardy to give very serious consideration to purchasing private insurance." *Id.* at 394. The court noted that "[t]he lower courts have generally found mandatory insurance provisions to be unconstitutional prior restraints on speech." *Id.* at 393 (citing cases).

Although the plaintiff in *Van Arnam* was not indigent, either purchasing insurance to protect herself against the risks of indemnifying the government or self insuring and facing the prospect of "unlimited personal liability" would be "a serious financial burden for her – one that could (and in fact did) completely deter her from speaking on federal property." *Id.* at 406. As a result, the court, applying intermediate scrutiny, *see id.* at 401, held that the indemnification requirement was not narrowly tailored to serve a significant governmental interest as applied to one who "cannot reasonably afford the financial demands it makes." *Id.* at 407.

In *Wilson*, the National Socialist party, which "espouses racial separatism and seeks to promote the interests of white Americans," sought to hold a rally in a public park. 1993 U.S. Dist. LEXIS 9726, at *2. The state agency responsible for administering the park and regulating its usage maintained a permit system requiring applicants to carry liability insurance in an amount between $100,000 and $1,000,000. *Id.* at *3. The court applied intermediate scrutiny and held this requirement unconstitutional as applied to persons unable to afford insurance coverage. *See id.* at *8-10. Although the state had "a significant interest in protecting against damage to public property and liability for personal injury," *id.* at *8, the imposition of an insurance requirement on those unable to afford it was not a narrowly tailored means of advancing that interest, particularly given

the availability of "more narrow and less restrictive measures such as prudent site selection and policing." *Id.* at *11.

Also instructive is *Pritchard*.  In *Pritchard*, the Ku Klux Klan sought to hold a rally in a public park next to the Davie, Florida Town Hall.  811 F. Supp. at 666.  Town officials informed the plaintiffs, the Klan and its representative, that although there was no permit requirement, they would have to obtain one million dollars of liability insurance coverage to hold the rally.  *Id.* at 666-67.  The Klan representative, who was unemployed, could not afford the premium and brought suit alleging a violation of his First Amendment rights.  *Id.* at 667.

The court held that the insurance requirement placed an impermissible burden on the First Amendment rights of the plaintiff and his organization.  *See id.* at 668-69.  By failing to provide an exemption for indigent persons, the requirement denied such persons "an equal opportunity to be heard." *Id.* at 668.  The court also noted the possibility that groups with unpopular views (such as the plaintiffs) could have difficulty obtaining insurance coverage.  *Id.*; *see also Van Arnam*, 332 F. Supp. 2d at 396 ("[T]hird-party insurers will inevitably make content-based fee determinations. . . .  [A] private insurer would apply content-, speaker-, and viewpoint-based criteria in determining whether to offer event liability insurance and, if so, how much to charge.").  The court therefore held the requirement unconstitutional and enjoined its enforcement against the plaintiffs.  *Pritchard*, 811 F. Supp. at 669.

Turning to the present case, we conclude that section 165-4 of the Original Town Code is fundamentally incompatible with the principle that "[f]reedom of speech . . . [is] available to all, not merely to those who can pay their own way." *Murdock*, 319 U.S. at 111.  People of limited financial means who wish to exercise their First Amendment rights may not be shut out of the public square.

33

Whatever marginal benefit the Town might derive from choosing not to exempt indigent persons from its insurance requirement does not justify the very substantial burden this decision placed on plaintiff's rights of freedom of speech and assembly.

Moreover, several courts have recognized that an insurer can be expected to charge a higher premium to insure what it sees as a more controversial or unpopular event, to account for the fact that unpopular speech is more likely to result in a hostile or even violent response from third parties. *See Van Arnam*, 332 F. Supp. 2d at 396; *Pritchard*, 811 F. Supp. at 668. This raises the unacceptable possibility that plaintiff's ability to exercise her First Amendment rights will depend on the content of her speech. *Cf. Hobbs v. County of Westchester*, 397 F.3d 133, 148-49 (2d Cir. 2005) ("In short, regulations of speech based on its content 'are presumptively invalid.'") (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)); *Forsyth*, 505 U.S. at 134-35 (invalidating permit fee system under which the amount of the fee varied with the "the administrator's measure of the amount of hostility likely to be created by the speech based on its content").

Under the intermediate scrutiny standard applicable here, defendants are not required to show that the challenged provision is the least restrictive means available for advancing the governmental purpose of limiting liability for injuries occurring in conjunction with a public gathering. *See Ward*, 491 U.S. at 797. Nevertheless, we agree with the *Wilson* court that the availability of "more narrow and less restrictive measures such as prudent . . . policing" supports the conclusion that section 165-4 of the Original Town Code is not tailored narrowly enough to survive intermediate scrutiny. 1993 U.S. Dist. LEXIS 9726, at *11; *cf. E. Conn. Citizens*, 723 F.2d at 1057.

In conclusion, by completely excluding plaintiff's expressive activity from the public square because of her inability to afford the cost of insurance, section 165-4 burdens substantially more

34

speech than is necessary to advance the Town's interest in limiting its liability for personal injuries or other damages relating to her use of Town property. *See Ward*, 491 U.S. at 799. Section 165-4 therefore violates the First Amendment as applied to plaintiff.


### C. The Village Insurance Requirement

The Village Code requires the users of Village property to provide insurance in certain circumstances:

> § 125-23.    Insurance
>
> A.    Each permit applicant who seeks to use a Village building for any purpose or who seeks to use Village property for organized sport, recreational, picnic or similar purpose shall provide liability insurance, name the Village of Washingtonville as an additional insured, in the minimum amount of $1 million. For organized sport, recreation, picnic or similar uses, the Board of Trustees may require a greater amount on a case-by-case basis.
>
> B.    An applicant who seeks to use Village property outside of a building for First Amendment purposes shall not be required to provide liability insurance.

WASHINGTONVILLE, N.Y. CODE § 125-23 (2007). The 2008 Amendments did not alter this section. Plaintiff interprets section 125-23 to mean that "applicants who wish to stage a public assembly on Village property that is not in front of a Village building" must obtain a $1 million insurance policy pursuant to section 125-23(A). (4th Am. Complt. ¶ 53.) This interpretation is plainly a reasonable one.

The Village insurance requirement, like the Original Town insurance requirement, does not provide an exemption for indigent applicants. To the extent that section 125-23 of the Village Code requires persons who can not afford insurance coverage to obtain coverage in order to exercise their

First Amendment rights in a public forum, it is unconstitutional for the same reasons that section

165-4 of the Original Town Code was unconstitutional.

## VI. <u>The Lack of an Exemption for Small Groups</u>

Section 221-1 of the Town Code provides in relevant part:

> Any person or group seeking to hold or conduct an outdoors field day, sporting event, carnival, picnic, concert, address, rally, assembly, or other gathering at a Town park and at which more than eighteen (18) persons are expected to attend must first obtain a permit approved by the Town Board. Any person or group seeking to use any other Town-owned property, regardless of the number of persons expected to attend, must first obtain a permit approved by the Town Board.

BLOOMING GROVE, N.Y. CODE § 221-1 (2008). Plaintiff argues that this section is unconstitutionally

overbroad because it imposes a permit requirement on small groups gathering in public forums such

as streets and sidewalks. (*See* 4th Am. Complt. ¶ 36.)

This argument is well taken. The Sixth Circuit has observed that "[p]ermit schemes and

advance notice requirements that potentially apply to small groups are nearly always overly broad

and lack narrow tailoring." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d

600, 608 (6th Cir. 2005). In *American-Arab Anti-Discrimination Committee*, the Sixth Circuit struck

down an ordinance requiring prior approval for "special events" including "any walkathon,

bikeathon, or jogging group or other organized group having a common purpose or goal, proceeding

along a public street or other public right-of-way in the City of Dearborn." *Id.* (internal quotation

marks omitted). The court held this provision lacked narrow tailoring and was "hopelessly

overbroad." *Id.* By its terms the permit requirement would apply to "almost any imaginable

procession on Dearborn's streets or sidewalks," from "a small group of protestors" to "a group of

senior citizens walking together to religious services." *Id.* Since most groups of people peacefully using a public right of way do not implicate the city's interests in crowd control and safety, the ordinance was not narrowly tailored to those interests. *Id.*

In *Santa Monica Food Not Bombs*, the Ninth Circuit addressed a challenge to an ordinance that required a permit for a "parade, procession, march or assembly . . . which is to assemble or travel in unison on any public street, highway, alley, sidewalk or other City-designated public way and which . . . may impede, obstruct, impair or interfere with free use of such . . . public way." *Id.* at 1027. The court held that the provision was not narrowly tailed because it did not contain an exception for small groups. The court reasoned that

> the significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks. . . . Without a provision limiting the permitting requirements to larger groups, or some other provision tailoring the regulation to events that realistically present *serious* traffic, safety, and competing use concerns, significantly beyond those presented on a daily basis by ordinary use of the streets and sidewalks, a permitting ordinance is insufficiently narrowly tailored to withstand time, place, and manner scrutiny.

*Id.* at 1039 (citations omitted) (emphasis in original); *see also Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996); *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990); *World Wide St. Preachers' Fellowship v. City of Grand Rapids*, 2007 U.S. Dist. LEXIS 35698, at *17-18 (W.D. Mich. May 16, 2007).

Section 221-1 of the Town Code requires a person holding "a gathering" on Town-owned

non-park property to obtain a permit beforehand, "regardless of the number of persons expected to attend." Two or three people talking to each other while standing on a street corner or walking along a street or sidewalk would fall within the statute's literal ambit. A statute that requires prior official approval of such activities is obviously not narrowly tailored to a significant governmental interest in safety, traffic control or anything else.[7] It is also significantly overbroad. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 608. Because it does not exempt from the permit requirement small groups gathering in or proceeding through public forums, Section 221-1 of the Town Code is unconstitutional.

VII.   **Defendants' Alleged Discretion to Vary the Permit Fee**

Plaintiff claims that the provisions of the Town and Village Codes governing permit fees are unconstitutional because they grant Town and Village officials discretion to vary the fee on a case-by-case basis, which creates the risk that officials might base the fee on the content of the applicant's speech. (*See* 4th Am. Complt. ¶¶ 26, 48.) As discussed above, public-assembly permit systems that give government officials unfettered discretion to set a permit fee, or at that allow officials to set the fee based on the content of the applicant's speech, are unconstitutional because they raise the risk of content-based discrimination. *See, e.g.*, *Forsyth*, 505 U.S. at 132-34.

The Town and Village ordinances under review here, however, do not grant that sort of discretion. As amended in 2008, the Town and Village Codes provide:

> Each permit applicant shall pay a permit application fee upon submission of the application. The fee shall be established by resolution of the Town Board [the Village Board of Trustees] and may be amended by resolution from time to time.

---

[7] Defendants have not offered any justification for the lack of a small-group exemption.

> The fee shall be reasonably equivalent to the administrative cost of processing the application. An applicant who is indigent and who seeks to exercise First Amendment rights shall be exempt from this requirement.

BLOOMING GROVE, N.Y. CODE § 221-8 (2008); WASHINGTONVILLE, N.Y. CODE §125-19(c) (2008).

These provisions do not, as we understand them, give Town or Village officials the discretion to vary permit fees on a case-by-case basis. The language providing that the fee is to be established "by resolution" and "amended by resolution from time to time" clearly indicates otherwise. These provisions call on the Town and Village Boards to set a generally applicable fee and then adjust it periodically to reflect the cost of processing applications. We think this is the only reasonable interpretation, and we will not strain to impose any other, in light of "the well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (citing cases); *see also NLRB v. Golub Corp.*, 388 F.2d 921, 928 (2d Cir. 1967). Moreover, the requirement that the fee "be reasonably equivalent to the administrative cost of processing the application" is further protection against abuse. A permit fee that is limited to the cost of processing the application is constitutional. *See Cox*, 312 U.S. at 577; *Nationalist Movement*, 481 F.3d at 183; *Nat'l Awareness Found. v. Abrams*, 50 F.3d 1159, 1165 (2d Cir. 1995).

Plaintiff's claim for an injunction prohibiting defendants from enforcing section 221-8 of the Town Code and section 125-19(c) of the Village Code is dismissed.

## VIII.    Discretion to Expedite Permit Applications and Appeals of Permit Denials

Plaintiff challenges the provisions of the Town and Village Codes governing the amount of time in which defendants must rule on permit requests and appeals of permit denials. Section 221-1 of the Town Code provides:

> An applicant who seeks to use Town property or facilities for a First Amendment purpose must apply at least five (5) days prior to the planned use of property or facilities. However, if the applicant demonstrates that a shorter time period for decision is necessary due to the time-sensitive nature of the intended use or event, then the Town Board shall hold a special meeting in order to act on the application.

The Village Code contains a similar provision. *See* WASHINGTONVILLE, N.Y. CODE § 125-10 (2008). Section 221-11 of the Town Code governs appeals of permit denials and provides in relevant part:

> The Town Board must act on the appeal at its next regularly scheduled Town Board meeting . . . . If the applicant demonstrates that a Town Board decision on appeal prior to the next regularly scheduled Town Board meeting is necessary due to the time-sensitive nature of the intended use or activity, then the Town Board shall hold a special meeting to consider and act on the applicant's appeal.

Section 125-21 of the Village Code contains substantially identical language. *See* WASHINGTONVILLE, N.Y. CODE § 125-21 (2008).

Plaintiff argues that these provisions are unconstitutional because they grant Town and Village officials discretion to determine whether an event is "time sensitive." (*See* 4th Am. Complt. ¶¶ 34, 57.) First, we note that an applicant can avoid having to demonstrate the "time-sensitive" nature of a planned event by applying for a permit at least five days ahead of time – a reasonable requirement because Board consideration is necessary.[8] And even this requirement is waived on a showing that the event is "time sensitive." We are not persuaded that the "time sensitive" determination is as discretionary as plaintiff suggests. Whether an event is "time sensitive" is not an inherently subjective inquiry. It would involve such objective factors as whether the proposed gathering is a response to events recently in the news or is intended to influence a future event, such as an election or legislative action. Moreover, there is no allegation that defendants have applied the

---

[8] Plaintiff does not argue that the five-day provision is unconstitutional.

"time sensitive" provisions in a discriminatory manner,[9] and on the record before us we find no reason to believe that they would do so in the future. We conclude that these provisions of the Town and Village Codes are a reasonable and content-neutral regulation of First Amendment activity. These provisions are therefore constitutional.

## IX.    **The Town Code's Definition of Traditional Public Forums**

Plaintiff next challenges section 221-9 of the 2008 Town Code, which discusses traditional public forums. Section 221-9 provides in full:

First Amendment activity.

Use of Town-owned traditional public forums for First Amendment activity is permitted pursuant to this Chapter. A traditional public forum is Town-owned property that has been traditionally available for expressive activity by members of the public. Town-owned streets, sidewalks and parks are deemed traditional public forums.

Plaintiff claims that section 221-9 "is unconstitutional because a non-lawyer will not know which parks and other public spaces are legitimate locations for public assemblies, and whether a given location is a 'traditional' public forum." (4th Am. Complt. ¶ 39.)

This argument is without merit. Plaintiff has not offered any authority suggesting that a provision such as this is unconstitutional, and we are not aware of any. Moreover, the suggestion that permit applicants will not know "which parks and other public spaces are legitimate locations for public assemblies" is clearly unfounded, since the statute states without qualification that Town-owned traditional public forums are open to First Amendment activity, and that Town-owned streets,

---

[9] In fact, the record is silent on whether defendants have ever had occasion to apply these provisions.

sidewalks and parks are traditional public forums. There is nothing ambiguous or contrary to the First Amendment in this statutory definition.

Plaintiff also contends that section 221-9 is unconstitutional because "traditional public forums are not the only locations where municipalities must permit speech. While 'designated' and 'limited' public forums are also legitimate places for First Amendment activity, [section 221-9] does not authorize noncommercial speech in these locations." (*Id.*) Although plaintiff is correct that the statute does not expressly authorize speech in designated or limited public forums, neither does it expressly prohibit First Amendment activity in such locations. Plaintiff would have the Court interpret this silence as an unlawful prohibition on expressive activity in Town-owned designated and limited public forums. But nothing in the text of the statute suggests that this is an appropriate construction, and adopting it would violate the principle that "statutes will be interpreted to avoid constitutional difficulties." *Frisby*, 487 U.S. at 483. Instead, we conclude from the statute's silence on this issue – as well as the lack of evidence in the record to the contrary – that the Town does not intend to prohibit expressive activity in designated or limited public forums under circumstances where the Constitution would require that such activity be permitted.


**CONCLUSION**

For all of the foregoing reasons, each motion is granted in part and denied in part.

Plaintiff's motion for summary judgment against defendant Town of Blooming Grove (the "Town") is granted as to her claim for damages based on the Town's attempt to enforce section 165-4 of the Original Town Code against plaintiff in October and November of 2006. Plaintiff's claim for nominal damages based on the 2007 Town Code's designation of the Moffat Hall property as

"not a traditional public forum" is granted as well.

The Town is permanently enjoined from enforcing section 221-1 of the 2008 Town Code insofar as that section requires a group seeking to use a Town-owned public forum for First Amendment activity to obtain permit approval "regardless of the number of persons expected to attend."

Plaintiff's motion for summary judgment against the Town is denied in all other respects, and the Town's motion to dismiss is granted in all other respects.

The Village of Washingtonville (the "Village") is permanently enjoined from enforcing section 125-23 of the 2008 Village Code insofar as that section requires all permit applicants to purchase an insurance policy without an exception for indigent applicants.

Plaintiff's motion for summary judgment against the Village is denied in all other respects, and the Village's motion to dismiss is granted in all other respects.

Counsel are directed to contact the Court within one week of the issuance of this Opinion and Order to schedule a conference on the issue of damages.


SO ORDERED.

Dated: White Plains, New York
      July 7, 2008

_William C. Conner_
Sr. United States District Judge

43